70 F.3d 1262
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Erick Jose JIMENEZ-RODRIGUEZ, Petitioner,
v.
U.S. IMMIGRATION & NATURALIZATION SERVICE, Respondent.
 No. 95-1189.
 United States Court of Appeals, Fourth Circuit.
 Argued Oct. 31, 1995.
Decided Dec. 6, 1995.
 
 On Petition for Review of an Order of the United States Immigration and Naturalization Service. (A28-072-449)
 ARGUED: Parastoo Golesorkhi-Zahedi, Vienna, Virginia, for Petitioner. Lisa Marie Arnold, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. ON BRIEF: Frank W. Hunger, Assistant Attorney General, Donald E. Keener, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.
 I.N.S.
 PETITION DENIED.
 Before HAMILTON, MICHAEL, and MOTZ, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Erick Jose Jimenez-Rodriguez, a native and citizen of Nicaragua, petitions for review of the Board of Immigration Appeals' (BIA) decision affirming the decision of the immigration judge (IJ), denying his application for asylum and withholding of deportation under sections 208(a) and 243(h) of the Immigration and Nationality Act ("INA" or "Act"), 8 U.S.C. Secs. 1158(a) and 1253(h). We have jurisdiction pursuant to 8 U.S.C. Sec. 1105a(a), and we deny the petition.
 
 I.
 A.
 
 2
 Jimenez-Rodriguez's deportation hearing was held before the IJ on October 22, 1990, and a summary of the evidence follows.
 
 
 3
 Jimenez-Rodriguez was born in Managua, Nicaragua, on August 16, 1966. He entered the United States without inspection in 1987. From 1983-1985 he served in the Nicaraguan army as a conscripted soldier. During that time the government and military of Nicaragua were controlled by the Sandinistas. In October 1984 his commander ordered him to shoot an older man who was believed to be a Contra. Jimenez-Rodriguez refused, and he claims that thereafter his "life was torture." In particular, he claims that he was not allowed to carry a weapon, he was forced to march without boots, and he was assigned demeaning tasks such as assisting the cook. He was required to carry a 100-pound bag of rice on his back for two to fours hours at a time. He was made to stand guard duty for long periods at night without a weapon; in other words, he claims that he was set up to be killed by the Contras. When he was sick with malaria, he was refused medicine. Often, he was not given water, and he was forced at times to remove his shirt for several hours in the hot sun. He was ostracized, accused of being a Contra and a traitor, and told by his commanding officer that he was not going to leave the army alive. After Jimenez-Rodriguez completed his military service, he was required to report for reserve duty, where he worked for the same commander under whom he had previously served. While on reserve duty, Jimenez-Rodriguez claims that he was made to shine shoes and perform other demeaning tasks.
 
 
 4
 On July 9, 1986, Jimenez-Rodriguez found the words "traitor to your country" spray painted in red and black on the front of his house. Threatening letters were slipped under his door. The letters said that his days were numbered and that traitors know what happens to them. In addition, Jimenez-Rodriguez claims that he was fired from his job at the Ministry of Health due to accusations made by the Sandinistas. He was also denied a scholarship for education in Mexico.
 
 
 5
 Finally, Jimenez-Rodriguez testified that although his father remains in Nicaragua, most of his family left the country because of persecution and now live in Costa Rica. One brother was granted asylum in the United States, and an uncle, who was accused of lending his lands to the Contras, was detained by the Sandinistas.
 
 
 6
 Under questioning by the IJ, Jimenez-Rodriguez admitted that "the final straw ... that made [him] leave Nicaragua" was his inability to find work and to support himself and his family.
 
 
 7
 In accordance with 8 C.F.R. Sec. 208.11, the IJ also considered the assessment of the State Department's Bureau of Human Rights and Humanitarian Affairs (BHRHA). In a letter dated July 31, 1990, the BHRHA opined that Jimenez-Rodriguez had "not established a well-founded fear of persecution upon return to Nicaragua...." This opinion was based "upon an evaluation of the specific information provided in the application, together with [BHRHA's] current analysis of country conditions in Nicaragua." The BHRHA noted that "[i]n free elections held February 25, the United Nicaraguan Opposition coalition defeated the Sandinistas, and President Chamorro, representing UNO, took office April 25." As a result of this change in conditions, the BHRHA concluded that the political and human rights situation in Nicaragua had changed dramatically.
 
 B.
 
 8
 In his decision the IJ took particular note of the dramatic change in government in Nicaragua. The IJ concluded that "under the totality of the circumstances" there was no evidence to support a reasonable possibility (let alone a clear probability) that Jimenez-Rodriguez, upon return to Nicaragua today, would be the object of persecution because of any imputed political opinion or for his prior refusal to obey a military order. Accordingly, the IJ denied Jimenez-Rodriguez's claim for asylum and withholding of deportation.
 
 
 9
 On November 7, 1994, the BIA affirmed the IJ in a per curiam opinion. The BIA stated that it had "reviewed the record of proceedings, the immigration judge's decision, and the respondent's contentions on appeal." The BIA found that "the immigration judge adequately and correctly addressed the issues on appeal" and affirmed the IJ's decision "based upon and for the reasons set forth therein." Jimenez-Rodriguez now petitions for review.
 
 II.
 
 10
 Because the BIA based its decision on the reasoning of the IJ, we review the IJ's decision. Gandarillas-Zambrana v. Board of Immigration Appeals, 44 F.3d 1251, 1255 (4th Cir.1995); Panrit v. INS, 19 F.3d 544, 546 (10th Cir.1994). We review for "substantial evidence" the IJ's decision to deny both withholding of deportation and "refugee" status for purposes of asylum. Cruz-Lopez v. INS, 802 F.2d 1518, 1519 n. 1 (4th Cir.1986). Even if an applicant is deemed a "refugee," the refusal to grant him asylum is reviewed for abuse of discretion. Id.[1] Section 208(a) of the INA, 8 U.S.C. Sec. 1158(a), authorizes the Attorney General, in her discretion, to grant asylum to an applicant who is a "refugee" as defined in the Act. To qualify as a refugee, the applicant must be unwilling to return to his native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular group, or political opinion." 8 U.S.C. Sec. 1101(a)(42)(A).
 
 
 11
 The "well-founded fear of persecution" standard for asylum eligibility contains both a subjective and an objective element. The subjective element requires that the applicant's fear be genuine. Figeroa v. INS, 886 F.2d 76, 79 (4th Cir.1989). The objective element requires a showing of "credible, direct, and specific evidence ... of facts that would support a reasonable fear that the [applicant] faces persecution." Id. (citation and internal quotes omitted). The probability of persecution does not, however, have to be high; "one can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." INS v. Cardoza-Fonseca, 480 U.S. 421, 431 (1987).
 
 
 12
 An applicant may also be entitled to asylum based on past persecution even if there is no risk of future persecution. However, under this "general humanitarian principle," an applicant must show that he or his family has " 'suffered under atrocious forms of persecution' " in the past. Matter of Chen, Int. Dec. 3104, at 4 (BIA 1989) (quoting The Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees, at 136 (Geneva, 1979)); see Acewicz v. INS, 984 F.2d 1056, 1062 (9th Cir.1993).
 
 
 13
 In this case, even assuming that a political opinion may be imputed to Jimenez-Rodriguez, substantial evidence supports the IJ's decision that he does not have a well-founded fear of persecution. Most importantly, the IJ took administrative notice of the fact that the government in Nicaragua had changed since Jimenez-Rodriguez departed the country and that a democratically elected government is now in place. Moreover, while Jimenez-Rodriguez argues that the Sandinistas still control the military, the IJ pointed out that Jimenez-Rodriguez has completed his military service and that by executive order there is no longer conscription in Nicaragua.
 
 
 14
 As for Jimenez-Rodriguez's claims of abuse at the hands of his military commander, the IJ noted that there was nothing in the record to show that the commander--even if he remains in Nicaragua--is still in the military or still inclined to act adversely against Jimenez-Rodriguez. Thus, irrespective of whether Jimenez-Rodriguez subjectively fears returning to Nicaragua, objective factors do not support his claim that he will suffer persecution in the future.
 
 
 15
 Jimenez-Rodriguez argues, however, that because of the past persecution he suffered, the IJ and the BIA erred when they failed to grant him asylum under the decision in Chen. According to Jimenez-Rodriguez, he was threatened with death on several occasions, mistreated in the army, denied medication when sick, unfairly fired from his job, and rejected for a scholarship. Also, members of his family have suffered persecution at the hands of the Sandinistas.
 
 
 16
 The IJ conceded that Jimenez-Rodriguez presents a "sad story." Nevertheless, while Jimenez-Rodriguez was harassed and deprived of food and medical attention, the record does not show that either he or any member of his family suffered the kind of severe or systematic and ongoing persecution that would rise to the level of "atrocious." Accordingly, Jimenez-Rodriguez is not entitled to asylum under the decision in Chen.[2] Finally, the standard for withholding of deportation is more stringent than the standard for a grant of asylum. INS v. Cardoza-Fonseca, 480 U.S. 421, 431-32 (1987). Jimenez-Rodriguez must show a "clear probability of persecution." Id. at 430. As Jimenez-Rodriguez cannot establish that he is entitled to asylum, he cannot meet that more stringent standard entitling him to withholding of deportation.
 
 III.
 
 17
 For the reasons stated, we deny the petition for review.
 
 
 18
 PETITION DENIED.
 
 
 
 [1]
 Jimenez-Rodriguez argues that the BIA did not apply the proper standards of review because it failed to conduct a de novo review and summarily affirmed the findings and conclusions of the IJ. This argument is without merit. The BIA has discretion to adopt and affirm the IJ's decision after independently reviewing the record. Alaelua v. INS, 45 F.3d 1379, 1382 (9th Cir.1995); see Gandarillas-Zambrana, 44 F.3d at 1255; Panrit, 19 F.3d at 546. The BIA's decision makes plain that such independent review occurred here
 
 
 [2]
 In Chen, the applicant's father was a Christian minister in China who had been systematically tortured for eight years during the "Cultural Revolution." The father was dragged through the streets in humiliating fashion over fifty times and was daily required to write confessions of his "crimes." In November 1967, during a Bible burning crusade, the father was pushed into a bonfire of Bibles. He was badly burned but survived. The father eventually died in 1974, at the age of 46. From age eight, Chen himself was tortured and harassed. Among other things, he was locked in a room with his grandmother and kept there for over six months. He was not allowed to attend school for awhile and was interrogated on a continuing basis. When he cried, he was kicked, bitten, and deprived of food. On one occasion, he fell asleep during a speech regarding the need to criticize one's parents. Rocks were thrown at him. They struck his head and he suffered a serious loss of blood. His injuries required a month of intensive treatment. We could go on